**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| **CONVERGENZ, LLC,** | ) |
| **a Virginia Limited Liability Company,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:21-cv-01404** |
| | ) |
| **CSI IT, LLC,** | ) |
| **a Delaware Limited Liability Company,** | ) |
| **BRAD COOPER, an Individual** | ) |
| | ) |
| **Defendants.** | ) |

**PLAINTIFF CONVERGENZ, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Convergenz, LLC ("Convergenz") built its staffing business by offering its clients individualized attention from specialized employees. At Convergenz, Defendant Brad Cooper ("Cooper") managed a single client account, BNSF Railway ("BNSF"). Not only did Cooper develop intimate knowledge of BNSF's hiring process and preferences, Convergenz trained Cooper in its unique methods of identifying, recruiting, and placing candidates with its clients. After Convergenz and Cooper terminated their relationship, Cooper went to work for Defendant CSI IT, LLC ("CSI"), another staffing and recruitment company and a competitor of Convergenz. Convergenz's narrowly drawn employment agreement with Cooper prohibits Cooper from working for his former clients. Yet no sooner did Cooper begin his employment with CSI than he began to compete with Convergenz for the same BNSF placements. CSI has continued to task Cooper with BNSF placements despite notification of Cooper's contractual non-compete obligations. Convergenz respectfully asks this Court to prohibit CSI from continuing to interfere with Cooper's employment agreement and to prohibit Cooper from continuing to violate his

agreement.

I.     **FACTUAL BACKGROUND**

    A.     **Convergenz Grew Its Business by Investing in Its Employees and Protecting the Customer Relationships They Develop and Maintain.**

Since entering the marketplace in 2000, Convergenz has established itself as a leading provider of technical and professional recruiting, staffing, and business services to companies throughout the United States. Declaration of Greg McGuire ("McGuire Decl."), ¶ 2 (attached as **Exhibit 1**). Convergenz specializes in providing its customers with personnel for assignments in a wide variety of industries, including information technology, government, healthcare, infrastructure, life sciences, and finance. *Id.*, ¶ 3. Convergenz has grown into a successful and competitive leader in the staffing industry with more than 400 clients and 15,000 total placements over 21 years. *Id.*, ¶ 4.

Convergenz's industry is highly competitive, and success in the industry depends on, among other things, identifying and developing relationships with customers. *Id.*, ¶ 5. By fostering customer relationships, staffing companies learn specific customer needs and preferences. *Id.*, ¶ 6. The combination of customer relationships and an ability to locate, evaluate, and present successful staffing candidates provides Convergenz with a competitive advantage in the industry. *Id.*

Through its customer relationships, Convergenz has compiled and created valuable confidential information, including but not limited to, customer contact lists, customer leads and prospects, customer histories and analyses, marketing plans, data analytics, market strategies and analyses, information about key customer relationships and the terms thereof, including pricing, customer needs and preferences, recruiting assessments, and Convergenz's business practices and plans. *Id.*, ¶ 7.  Convergenz's employees draw on this growing body of historical knowledge to

provide its clients with the exceptional service they have come to expect from Convergenz. *Id.*, ¶ 8.

Convergenz owes its success to its focus on investing in employees who provide high quality service to, and establish lasting relationships with, its customers. *Id.*, ¶ 9. In addition, Convergenz's employees focus continuously on ways to help customers grow their businesses and improve their profits. *Id.*, ¶ 10. Convergenz invests heavily in training its employees and gives them the tools, including valuable confidential information, they need to develop and maintain customer relationships and to succeed in the highly competitive staffing industry. *Id.*, ¶ 11.

Given the importance of Convergenz's business relationships and confidential information, Convergenz undertakes significant efforts to protect itself from unfair competition by former employees, including, but not limited to, requiring key employees to sign contracts containing restrictive covenants. *Id.*, ¶ 12. Convergenz is not unique in that regard, as restrictive covenant agreements are common for employers in the staffing industry. *Id.*, ¶ 13.

### B.   CSI Ignored Cooper's Contractual Obligations to Convergenz and Hired Him for a Competing Position.

Convergenz hired Cooper as a Director of Strategic Accounts on April 1, 2019. Compl., ¶ 13-14. Convergenz brought in Cooper with the primary intent to focus on one of Convergenz's main clients, BNSF, and the secondary objective of bringing in new business. *Id.*, ¶ 15. BNSF, whose executive offices are in Fort Worth, Texas, has been a Convergenz client since 2008. *Id.*, ¶ 16; McGuire Decl., ¶ 26. During his employment with Convergenz, Cooper worked from Convergenz's office in Addison, Texas, which is in the Dallas-Fort Worth metropolitan area. Compl., ¶ 22; McGuire Decl., ¶ 15.

Cooper's job duties as Director of Strategic Accounts included working closely with the Managed Service Provider Representative at BNSF as well as other managers at BNSF. Compl, ¶

17; McGuire Decl., ¶ 29. Cooper developed relationships and goodwill with BNSF managers and human resources staff. McGuire Decl., ¶ 29. Cooper was directed to learn BNSF's business, find job openings, and put Convergenz in the best possible spot to fill those openings. Compl., ¶ 18; McGuire Decl., ¶ 28. While employed by Convergenz, Cooper provided recruitment services to BNSF and filled several positions for BNSF. Compl., ¶ 35.

As Director of Strategic Accounts, Cooper had nationwide information about BNSF and collaborated with coworkers who specialized in other industries to develop strategies to grow Convergenz's business both within Texas and nationally. McGuire Decl. ¶ 30. Cooper reported to SVP Chris Matthews in Convergenz's Washington D.C. headquarters, who reported directly to Convergenz's managing partner, Greg McGuire. Declaration of Dustin Hughes ("Hughes Decl."), ¶ 3-4 (attached as **Exhibit 2**). Cooper was in a management position at Convergenz and managed a team of recruiters. *Id.* ¶ 5. In his management role, Cooper was directed to meet with his recruiting team on a weekly basis and provide job placement opportunities to his recruiting team. *Id.* ¶ 6. Given Cooper's expanded responsibilities as Director of Strategic Accounts, Convergenz provided him with confidential business information beyond that to which he would have had access as an Account Manager. McGuire Decl. ¶ 31.

While working at Convergenz, Cooper had access to Convergenz's confidential information and materials, including: customer contract terms and conditions; pricing information; lists of target customers; technical information related to Convergenz's screening criteria; and strategic and marketing plans. Compl., ¶ 19, 39. While employed by Convergenz, Cooper was introduced to BNSF personnel and Cooper received information related to BNSF's staffing needs and commission structure. *Id.*, ¶ 36. Cooper received information relating to Convergenz's strategy to attract qualified applicants quickly and be the first recruitment

company to meet BNSF's needs. *Id.*, ¶ 37.

The value of Convergenz's confidential information is derived in part from its secrecy, given the competitive nature of Convergenz's industry and the potential that a competitor could use such information to undercut Convergenz's business. *Id.*, ¶ 23. Due to the competitive nature of the technology recruitment industry, and because Convergenz spends substantial resources cultivating its customer relationships, Convergenz asks certain employees to abstain from unfairly competing with Convergenz for former clients, both during and following the term of their employment. *Id.*, ¶ 24. In the interest of protecting Convergenz's customer relationships and confidential information, Convergenz requires certain employees to agree to various restrictive covenants through written agreements as a condition of employment. *Id.*, ¶ 25. Convergenz takes reasonable precautions in protecting the dissemination of its confidential information, including requiring certain employees to enter restrictive covenants prohibiting their disclosure or use of such information, and restricting access to these materials to those employees who require such access to perform their employment duties. *Id.*, ¶ 26.

As a condition of working for Convergenz, Cooper executed an agreement entitled "Employment Agreement" ("Agreement") (Exh. 1, Attachment A). Cooper executed the Agreement before his first day of employment at Convergenz, on March 20, 2019. Compl. ¶ 28-29. The Agreement includes a "Non-Performance of Services and Non-Recruitment" clause. The clause prohibits Cooper from:

> "provid[ing] or attempt[ing] to provide, or solicit[ing] the opportunity to provide directly or indirectly, or advise others of the opportunity to provide, any services of the type [he was directed to perform by Convergenz] to or for the benefit of any Client (i) to which [Cooper] has provided services in any capacity on behalf of [Convergenz] or (ii) to which [Cooper] has been introduced, or about which [Cooper] has received information through [Convergenz], or through any Client for which [Cooper] has performed services in any capacity on behalf of [Convergenz]"

Agreement §8. The Agreement defines "Client" as including any affiliates, customers, and clients of Convergenz's clients. *Id*. The prohibition is in effect for a period of one year after the termination of Cooper's employment relationship with Convergenz. *Id*. The prohibition exclusively applies to the area within 100 miles of the location where from Cooper provided services on behalf of Convergenz. *Id*; McGuire Decl. ¶ 20.

The Agreement further includes a "Confidentially and Nondisclosure" provision which prohibits the disclosure of Convergenz's confidential information. The provision defines "confidential information and materials" as:

> include[ing], but [] not limited to all information belonging to Employer or Employer's Clients relating to their respective services and products, customers, business methods, strategies and practices internal operations, pricing and billing, financial data, costs, personnel information (including but not limited to names, education background, prior experience and availability), customer and supplier, contracts and needs, sales lists, technology, software, computer programs or other documentation, computer systems, inventions, developments, trade secrets of every kind and character, information designated by Employer or any of its clients as confidential, and all other information that might reasonably be deemed confidential.

Agreement §11.

On June 15, 2021, Convergenz terminated Cooper's employment with Convergenz. Compl., ¶ 41. On or around August 2021, Cooper accepted employment with CSI, working from Dallas, Texas. *Id.*, ¶ 45; McGuire Decl. ¶ 35. CSI, IT, LLC. ("CSI") is a company that offers customers technical recruiting and staffing services. CSI also provides consulting, IT strategy, and systems services, encompassing implementation, architecture, and design; systems engineering and integration; technology transfer; and enterprise resource management. Compl., ¶ 42. CSI and Convergenz regularly compete for the same customers, including BNSF. *Id.*, ¶ 43; McGuire Decl. ¶ 37. In his position at CSI, Cooper is marketing and

selling (or assisting others in marketing or selling) products or services that are competitive with those marketed and sold by Convergenz from within 100 miles of where he provided services for Convergenz. Compl., ¶ 46; Hughes Decl. ¶ 15-24.

Thus, in his position at CSI, Cooper performed services that were substantially similar and/or identical to those he provided while employed by Convergenz. Compl., ¶ 47. CSI was made aware of Cooper's obligations under the Agreement at the latest on September 10, 2021 when Convergenz's counsel contacted CSI's president, John Moschella, and CSI's Dallas branch manager, Ello Castille, via email and certified mail. Exh. 1, Attachment C, Letter to Moschella; Compl., ¶ 48. Cooper was sent a similar cease-and-desist letter. Exh. 1, Attachment D, Letter to Cooper. In his letters to CSI and Cooper, Convergenz's counsel highlighted that for a period of one year following Cooper's separation from Convergenz, Cooper is contractually prohibited from performing services for BNSF. Letter to Moschella and Castille; Letter to Cooper. Convergenz's counsel attached a copy of the Agreement with the letters. *Id.*

## II.   __ARGUMENT__

Despite receiving a cease-and-desist letter, CSI has knowingly continued to employ Cooper in a position that violates his restrictive covenant obligations. Cooper similarly has continued to ignore his contractual obligations to Convergenz. Defendants' ongoing unlawful conduct warrants a preliminary injunction.

### A.   **Standard of Review.**

A party seeking a preliminary injunction must demonstrate "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest." *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, (E.D. Va. 2018) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224,

230 (4th Cir. 2017) (citation omitted)).  Convergenz satisfies each of these requirements.

**B.      Convergenz Is Likely to Succeed on Its Breach of Contract Claims against CSI and Cooper.**

To prevail on its breach of contract claim, Convergenz must show (1) a legally enforceable contract; (2) breach of that contract; and (3) resulting injury or damages.  *Filak v. George*, 267 Va. 612, 619 (2004). Convergenz's evidence establishes all three elements.

**1.      Cooper's Employment Agreement Is Reasonable and Enforceable.**

In restrictive covenant cases, "[t]he central issue with respect to likelihood of success on the merits is whether the non-solicitation and non-compete clauses of the Agreement are enforceable or unenforceable under Virginia law." *Update, Inc.*, 311 F. Supp. 3d at 787.  Virginia courts will enforce restrictive covenant obligations that (1) are narrowly tailored to protect an employer's legitimate interests; (2) do not unduly burden an employee's ability to earn a living; and (3) do not offend public policy—in short, restrictions that are "reasonable" under the circumstances. *Capital One Fin. Corp. v. Kanas*, 871 F. Supp. 2d 520, 530 (E.D. Va. 2012); *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 144 (2013) (citations omitted).[1]

Factors relevant to reasonableness include the function, geographic scope, and duration of any restriction.  *Simmons v. Miller*, 261 Va. 561, 581 (2001).  Restrictions that are two (2) years or less, and geographically co-extensive with the employer's business, trend toward reasonable. *E.g.*, *JTH Tax, Inc. v. Frashier*, No. 2:09cv40, 2009 U.S. Dist. LEXIS 139767, * 7-8 (E.D. Va. Apr. 15, 2009) (finding a two-year, twenty-five (25) mile non-compete provision reasonable); *Roanoke Eng'g Sales Co. v. Rosenbaum*, 223 Va. 548, 551 (1982) (upholding a non-compete encompassing all "territory covered by" the employer because the employee had company-wide

---

[1] The Agreement is supported by adequate consideration. Cooper executed his agreement in connection with the start of his employment with Convergenz. *Paramount Control Co. v. Rector*, 380 S.E.2d 922, 926 (Va. 1989), overruled on other grounds by *Home Paramount Pest Control v. Shaffer*, 718 S.E.2d 762 (Va. 2011).

knowledge that would enable nationwide competition).

An employee's extensive customer contacts and access to confidential information likewise weigh in favor of reasonableness. *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 372-73 (1990) (noting that "non-competition agreements are also justified where the employee comes into personal contact with his employer's customers."); *Meissel v. Finley*, 198 Va. 577, 583 (1956) (finding that "possession of trade secrets and confidential information is an important consideration in testing the reasonableness of a restriction on competition."); *see also* 6 Williston on Contracts § 13:13 (4th ed.) (noting that when an employee, "by leaving, threatens to siphon off the former employer's customers or goodwill, the law typically permits greater restrictions to be imposed by contract."). The covenants in Cooper's agreement pass this test.

### a.    The Agreement's Non-Competition Covenants are Reasonable and Enforceable.

Convergenz "has a legitimate business interest in imposing a reasonable non-compete clause 'to protect itself from losing potential work to competitors through employees who leave the company and then compete . . . using the business sensitive knowledge and contacts they acquired'" as Convergenz employees. *Update, Inc.*, 311 F. Supp. 3d at 788 (quoting *Power Distrib. v. Emergency Power Engineering, Inc.*, 569 F. Supp. 54, 57 (E.D. Va. 1983)). The Agreement's non-competition provision is reasonably tailored to protect this legitimate business interest and therefore is enforceable.

First, the covenant appropriately limits Cooper's competitive activity to one year after the end of his Convergenz employment. "[T]he Supreme Court of Virginia has deemed reasonable even longer non-compete agreements." *Update, Inc.¸* 311 F. Supp. 3d at 789 (citing *Blue Ridge Anesthesia*, 389 S.E.2d at 470 (upholding a three-year non-compete); *Roanoke Eng'g Sales Co.*, 290 S.E.2d at 885 (three years); *Hair Club for Men, LLC v. Ehson*, No.1:16-cv-236, 2016 U.S.

9

Dist. LEXIS 118069, *12-13 (E.D. Va. Aug. 31, 2016) (two years)). Given Convergenz's significant investment in the customer relationships Cooper maintained and developed for Convergenz, the twelve-month limitation "allows [Convergenz] a reasonable time to convince customers to remain with [Convergenz] without interference from [Defendants]." *Update, Inc.*, 311 F. Supp. 3d at 789; *see also Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 393 (2012) (finding a twelve-month limitation "narrowly drawn").

The geographic scope of Cooper's non-competition agreement is similarly reasonable under Virginia law. The Agreement provides that an "Employee agrees that he/she shall not… within 100 miles provide…services… to or for the benefit of any Client to which Employee has provided services in any capacity on behalf of Employer." Agreement §8.  In other words, the restriction is limited only to the geographic area where Cooper most recently provided services for Convergenz. This geographic area is significantly narrower than the area where Florida-headquartered CSI's customer base is located. Virginia Courts have upheld clauses of a similar distance as reasonable. *See Int'l Limousine Serv., Inc. v. Reston Limousine & Travel Serv., Inc.*, 68 Va. Cir. 84 (2005) (barring the defendant from competing within 75 miles of complainant's principal place of business*)*; *New River Media Group, Inc. v.* Knighton, 245 Va. 367, 369-70 (1993) (holding that a "60-mile [] limit is not unduly harsh and oppressive indiminishing [the employee's] efforts to earn a living."); *Roanoke Eng'g Sales Co.*, 223 Va. at 553  (enforcing agreement prohibiting the employee from competing in Virginia or North Carolina).

The Virginia Supreme Court has even found non-compete agreements that lack a geographic restriction to be reasonable. In *Foti v. Cook,* 220 Va. 800, 805–07 (1980), the Virginia Supreme Court affirmed the trial court's decision to enforce a restrictive covenant which prohibited a former accounting firm partner from performing services for any client of the

partnership. The 24-month covenant in that case did not contain a geographic restriction, but rather centered on contact with former clients. *Id.* at 807. Where the duration and the restricted activity provisions are narrowly drawn, a large or even non-existent geographic scope provision may be enforced. *See Preferred Sys. Sols.*, 284 Va. 382, 394 ("The lack of a specific geographic limitation is not fatal to the covenant because the non-compete clause is so narrowly drawn to this particular project and the handful of companies in direct competition with [Complainant]"). As the Agreement only lasts one year and only bars the service or solicitation of Convergenz's clients, the 100-mile geographic provision is reasonable.

Finally, the non-competition provision is functionally reasonable. It prohibits Cooper only from performing services "to or for the benefit of any Client (i) to which [Cooper] has provided services in any capacity on behalf of [Convergenz] or (ii) to which [Cooper] has been introduced, or about which [Cooper] has received information through [Convergenz], or through any Client for which [Cooper] has performed services in any capacity on behalf of [Convergenz]." In short, the covenant prohibits only direct competition for Convergenz's clients. Under Virginia law, this prohibition is enforceable *in the staffing industry*. *Update, Inc.*, 311 F. Supp. 3d at 791 (enforcing a non-competition clause prohibiting the defendant from performing "the same or similar services as those that [he] provided to the plaintiff" during his employment for any entity that "provides legal staffing, managed review, legal consulting, information governance, electronic data discovery and litigation support services."); *see also NVR, Inc. v. Nelson*, No. 1:16-cv-1328, 2017 U.S. Dist. LEXIS 21829, *3-4, 13-14 (E.D. Va. Feb. 14, 2017) (finding reasonable a non-competition provision that broadly defined the employer's services as the "residential homebuilding, mortgage financing, or settlement services business," but limited the restriction to services directly competitive with those performed for the plaintiff employer); *Blue Ridge*

*Anesthesia*, 239 Va. at 369 (enforcing a non-competition agreement that prohibited work for any company that "render[ed] the same or similar services" as the plaintiff employer, provided that the defendant could perform noncompetitive work for those companies); *Roanoke Eng'g Sales,* 23 Va. at 553 (non-competition covenant reasonable because it was limited to activities similar to the business conducted by the plaintiff employer); *Apex Sys., LLC v. Beacon Hill Staffing Grp., LLC*, No. 3:21CV165, 2021 WL 5760854, at *11 (E.D. Va. Dec. 3, 2021) (finding reasonable a non-competition provision that "exclude[ed] subdivisions of a business, if any, which do not primarily engage in the Business of the [plaintiff]").

> **b.     The Agreement's Non-Solicitation Covenants are Reasonable and Enforceable.**

As discussed above, the covenant's twelve-month restricted period is well within the boundaries Virginia courts have found reasonable. *Update, Inc.*, 311 F. Supp. 3d at 789 (citing cases). The covenant prohibits Cooper from diverting business from or soliciting only those Convergenz clients "(i) to which [Cooper] has provided services in any capacity on behalf of [Convergenz] or (ii) to which [Cooper] has been introduced, or about which [Cooper] has received information through [Convergenz], or through any Client for which [Cooper] has performed services in any capacity on behalf of [Convergenz]." Agreement §8. Both this District and the Supreme Court of Virginia have upheld similar restrictions against employees who had direct and extensive customer interactions. *Update, Inc.*, 311 F. Supp. 3d at 790 (citing *Advanced Marine Enters., Inc.*, 501 S.E.2d at 155 (upholding as valid a non-solicitation clause barring soliciting of customers with whom the employee worked and customers within a fifty-mile radius of the former employer)); *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 827-28 (E.D. Va. 2011) (finding reasonable a non-solicitation clause barring the solicitation of customers "which were contacted, solicited or served by the Employee while employed by the Company….").

**2.    Cooper Breached His Restrictive Covenant Obligations to Convergenz and Convergenz has been injured.**

Cooper cannot legitimately dispute that he has breached his restrictive covenant obligations to Convergenz. BNSF is Cooper's former client and Cooper's place of employment is within a 100-mile radius of Cooper's former Addison, Texas Convergenz office.  As a Sales Director at CSI, Cooper is responsible for recruiting clients for positions designated by BNSF. These are the same duties he performed for Convergenz.

Despite his obligations under the Agreement related to the non-servicing and non-solicitation of Convergenz customers, Cooper assisted in a solicitation of BNSF on behalf of CSI. Compl, ¶ 50; Hughes Decl. ¶ 12. Convergenz discovered that Cooper was soliciting BNSF when around early September, 2021, Dustin Hughes, Convergenz's Director of Southwest Region, observed that Cooper had been sent an Outlook calendar invite for a BNSF recruiter meeting. Hughes Decl., ¶ 12.  During the meeting, Hughes heard Cooper speak with BNSF's managed service provider regarding the position involved. *Id.* ¶ 10-12.

On November 16, 2021, BNSF sent Cooper and other recruiters a calendar invite for a conference call concerning a "Axway Support / Developer (665912)" position BNSF sought to fill "asap." Compl., ¶ 51-52; Exh. 1, Attachment E, Nov. 16, 2021 Email from BNSF; Hughes Decl., ¶ 15-16. The conference call included Cooper, Convergenz recruiters, and other competitors of Convergenz. Exh. 1, Attachment E, Nov. 16, 2021 Email from BNSF; Hughes Decl., ¶ 16-18. On the November 16, 2021 conference call, Cooper asked the first question of BNSF and spoke up 3-4 times total on the call. Compl., ¶ 53; Hughes Decl., ¶ 19. Cooper inquired about the specific skillset and experience level of candidates that BNSF was seeking. Compl., ¶ 53; Hughes Decl., ¶ 20.

On December 8, 2021, BNSF and its recruiters met to discuss a .Net Developer position,

13

and Brad Cooper again spoke during this call. Hughes Decl., ¶ 21. On January 12, 2022, BNSF and its recruiters met to discuss a QA Analyst position, and Brad Cooper spoke during this call. Hughes Decl., ¶ 22. On February 8, 2022, BNSF and its recruiters met for a general supplier update, and Brad Cooper spoke during this call. Hughes Decl., ¶ 23. On March 7, 2022, BNSF and its recruiters met to discuss a "Release & Development Analyst (676837)" position, and Brad Cooper spoke during this call. Hughes Decl., ¶ 24.

Cooper's participation in the September 2021, November 16, 2021, December 8, 2021, January 12, 2022, February 8, 2022, and March 7, 2022 conference calls constitutes solicitation and servicing of Convergenz's clients within one year after his June 15, 2021 separation from Convergenz. No candidate from Convergenz was chosen by BNSF to fill the "Axway Support / Developer (665912)" position. McGuire Decl., ¶ 56; Hughes Decl., ¶ 34.[2] No candidate from Convergenz has been chosen by BNSF to fill the QA Analyst position or the Release & Development Analyst (676837) position. Hughes Decl., ¶ 35. Each position available at a Convergenz client that is filled by a competitor instead of Convergenz deprives Convergenz of revenue and deprives Convergenz recruiters of a commission. McGuire Decl., ¶ 60. Brad Cooper's breach of his restrictive covenant has also lowered morale among Convergenz recruiters. McGuire Decl., ¶ 61.

CSI has also used Cooper's experience and customer goodwill from his time at Convergenz

---

[2] Convergenz has proffered evidence that Cooper and CSI deprived Convergenz of a business opportunity. Hughes Decl., ¶ 33-34; Compl, ¶ 50-52. However, a recent case from this District suggests that evidence of damages is not required to obtain a preliminary injunction to enforce a non-compete agreement. *See Apex Sys., LLC v. Beacon Hill Staffing Grp., LLC*, No. 3:21CV165, 2021 WL 5760854, at *13-14 (E.D. Va. Dec. 3, 2021) ("To the extent that noncompete provisions are legitimate, it would be surprising if they could not be enforced until a plaintiff had suffered tangible and demonstrable harm. The injuries against which the terms serve to protect employers are of the kind that are not always easily quantifiable and where causation is difficult to prove.") (citing *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784 (E.D. Va. 2018) and *Robert Half Int'l, Inc. v. Billingham*, 315 F. Supp. 3d 419 (D.D.C. 2018)).

to leapfrog BNSF's contractor vetting process. Hughes Decl., ¶ 25. BNSF has Tier 1 and Tier 2 vendors for its recruitment tasks. *Id*., ¶ 26. BNSF's practice is to include all Tier 1 vendors when putting out a position for recruiters. *Id*., ¶ 27. Approved Tier 1 vendors are BNSF's preferred recruiters. *Id*., ¶ 26. BNSF's practice is to only include Tier 2 vendors if the Tier 1 vendors are not filling the position fast enough. *Id*., ¶ 28. Convergenz is a Tier 1 approved vendor, and CSI is not a Tier 1 approved vendor. *Id*., ¶ 29-30. Since Cooper began at CSI, CSI has been treated as if it were a Tier 1 vendor, and Cooper has been included in nearly every BNSF recruitment meeting. *Id*., ¶ 31. Obtaining Tier 1 status required Convergenz to make significant personnel and financial investments in its customer relationship with BNSF. *Id*., ¶ 32.

Cooper has violated his contractual obligations. Unless the Court enjoins him, he will continue to do so.

### C.     Convergenz Is Likely to Succeed on Its Tortious Interference Claim against CSI.

Convergenz is just as likely to succeed on its tortious interference claim against CSI.  To prevail on this claim, Convergenz must show (1) the existence of a valid contract; (2) CSI's knowledge of the contract; (3) intentional interference inducing or causing a breach of the contract; and (4) resulting injury or damages. *Duggin v. Adams*, 234 Va. 221, 226-27 (1987). First, for the reasons discussed above, Cooper's Agreement is valid and enforceable under Virginia law. Second, having received a cease-and-desist letter from Convergenz, CSI cannot legitimately dispute its knowledge of those agreements.  Finally, the evidence demonstrates CSI's intentional interference with Cooper's agreement.

Under Virginia law, to establish intentional interference, Convergenz need only show that CSI engaged in conduct that "violate[s] an established standard of a trade or profession, or involve[s] unethical conduct, [s]harp dealing, overreaching or unfair competition." *Duggin*, 234

15

Va. at 228. CSI's actions rise to this level because CSI has continued to assign Cooper clients in violation of his Agreement, despite receiving a cease-and-desist letter from Convergenz's counsel and a copy of the Agreement. McGuire Decl., ¶ 40-42; Hughes Decl., ¶ 15-24. CSI's actions are textbook tortious interference. *See Billingham*, 315 F. Supp. 3d at 436 (granting preliminary injunction under similar circumstances for continuing to employ its competitor's former employee in a competing position).

### D. Convergenz Will Suffer Irreparable Harm Without a Preliminary Injunction.

Convergenz has established that it will suffer irreparable harm in the absence of a preliminary injunction. The Fourth Circuit has recognized that "the ***threat*** of a permanent loss of customers and the ***potential*** loss of goodwill … support a finding of irreparable harm." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) (emphasis added), *abrogated on other grounds by*, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008)); *see also Update, Inc.¸* 311 F. Supp. 3d at 788 (noting that an employer is entitled "to protect itself from losing ***potential work*** to [a competitor] through employees who leave the company and then compete against [the employer] using the sensitive knowledge and contacts they acquired as an employee.") (emphasis added and citation omitted); *W. Industries-North, LLC v. Lessard*, 1:12cv177 (JCC/TRJ), 2012 U.S. Dist. LEXIS 38697, * 14-15 (E.D. Va. Mar. 21, 2012) (noting that a preliminary injunction is appropriate to protect against "loss of clients' goodwill and ***future business*** …") (emphasis added) (citations omitted). Cooper's continued employment with CSI and competing client solicitations poses the very risks against which a preliminary injunction protects. *Update, Inc.*, 311 F. Supp. 3d at 798 (noting that the "risk of losing future business opportunities" with clients constitutes irreparable harm).

In Cooper, CSI hired an experienced staffing professional "who could hit the ground

16

running in [his respective market], thereby allowing CSI 'to essentially skip much of the expensive, time-intensive' investment that [Convergenz] made in [him]." *Billingham*, 315 F. Supp. 3d at 434 (quoting *Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 860 (S.D. Iowa 2013) (acknowledging that this "would be an irreparable harm.")). Cooper brought to CSI the relationship and customer goodwill he acquired at Convergenz. This has allowed CSI to capitalize immediately on Cooper's presence, "without having to invest resources of its own to develop him into a productive asset." *Id.* The resulting competitive disadvantage to Convergenz is irreparable harm that justifies a preliminary injunction. *Id.*

Additionally, unless the Court enjoins it, CSI is incentivized to continue its practice of disregarding Convergenz's contractual rights. Neither Convergenz's cease-and-desist letter nor its filing of this lawsuit have slowed CSI's unlawful assignments of Cooper to service BNSF. Perhaps, an injunction will.

## E. The Balance of Equities Weighs in Convergenz's Favor.

The balancing of equities also weighs in favor of a preliminary injunction. As explained above, Convergenz will suffer irreparable harm should Cooper continue to work for CSI in a position that violates his employment agreement obligations. An injunction prohibiting Cooper from violating his agreement, on the other hand, will cause Defendants only minimal harm.

First, the restraint is temporary. Second, it will not prevent Cooper from working in the staffing services industry more than 100 miles from the Convergenz office in which he worked. Cooper can even work for CSI (or any other staffing company) *within* the hundred-mile radius as long as he does not solicit his former clients.

Importantly, Defendants have brought any harm from a preliminary injunction upon themselves. Cooper knew about the Agreement's restrictive covenants but still chose to disregard

them. CSI likewise knew of the restrictions on Cooper's employment but still chose to assign him to his former client, in violation of his contractual commitments. Defendants' cavalier approach to Convergenz's Agreement with Cooper is the reason they find themselves in this situation.  The balance of equities favors Convergenz in these circumstances. *Update, Inc.*, 311 F. Supp. 3d at 796; *see also TechINT Sols. Grp., LLC v. Sassnett*, No. 5:18-cv- 00037, 2018 U.S. Dist. LEXIS 166025, *19-20 (W.D. Va. Sept. 27, 2018) (balance of equities weighed in favor of enforcement where the defendant was prohibited only "from providing competing services to or soliciting [the plaintiff's] clients ….'); *Cheers Sports v. Hembach*, No. CL 00119333-00, 2019 Va. Cir. LEXIS 806, *9-10 (Loudoun County Feb. 8, 2019) (granting preliminary injunction after finding the balance of equities favored the plaintiff).

### F.   Public Interest Favors a Preliminary Injunction.

Virginia public policy favors the enforcement of reasonable, mutually agreed-upon restrictive covenants and fair competition in the marketplace. *E.g., Moller-Maersk A/S v. Escrub Sys., Inc.*, No. 1:07-cv-1276, 2007 U.S. Dist. LEXIS 94009, * 10-11 (E.D. Va. Dec. 21, 2007) ("Failure to grant a TRO and thereby inhibit further contract breach is harmful to the public's ability to rely on contract agreements."); *JTH Tax, Inc. v. Olivo*, No. 2:15-CV-345, 2016 U.S. Dist. LEXIS 17857, * 12 (E.D. Va. Feb. 12, 2016 ("Enforcement of valid non-compete clause aids public interest by preventing customer confusion and requiring parties to value the sanctity of contract.") (citation omitted); *Update, Inc.*, 311 F. Supp. 3d at 796 ("To be sure, contracts in restraint of trade are generally disfavored under Virginia law as a matter of public policy. But, Virginia law does encourage the enforcement of *valid* non-compete agreements, such as the one at issue here.") (emphasis in original) (citation omitted).

Convergenz invested significant time, money, and effort into helping Cooper learn and

succeed in the staffing industry. Public interest favors protecting Convergenz's investment. Accordingly, Convergenz has satisfied the fourth and final requirement for a preliminary injunction. *Centennial Broad, LLC v. Burns*, No. 6:06-CV-00006, 2006 U.S. Dist. LEXIS 70974, *38 (W.D.Va. Sept. 29, 2006) ("The public interest is served by the legal system's swift and clear enforcement of a fair and freely made contract.").

###### G.      The Court Should Waive the Bond Requirement or Impose a Nominal Bond.

The requested injunction merely restores the contractual rights of the parties and protects against unfair competition in the highly competitive staffing industry. Importantly, CSI can continue to employ Cooper in a position that does not violate his contractual obligations to Convergenz. As such, because CSI and Cooper will not suffer any harm from the injunction, Convergenz respectfully requests that the Court waive the bond requirement or impose only a nominal bond. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) (acknowledging that a district court can waive bond); *TechINT Sols. Grp., LLC*, 2018 U.S. Dist. LEXIS 166025, *22-23 (requiring only a nominal $200 bond).

### III.      **CONCLUSION**

For the reasons discussed above, Convergenz respectfully requests that the Court grant its Motion for Preliminary Injunction and enter an Order:

(1)  Prohibiting Defendant Brad Cooper from providing or attempting to provide, or soliciting the opportunity to provide directly or indirectly, or advising others of the opportunity to provide, any staffing services for BNSF or any other client to which Cooper has provided services in any capacity on behalf of Convergenz;

(2)  Prohibiting Defendant Brad Cooper from providing or attempting to provide, or soliciting the opportunity to provide directly or indirectly, or advising others of the opportunity to

provide, any staffing services for any other client to which Cooper has been introduced, or about which Cooper has received information through Convergenz, or through any Client for which Cooper has performed services in any capacity on behalf of Convergenz;

(3)   Prohibiting Defendant Brad Cooper from disclosing any "confidential information and materials" as that term is defined in Cooper's employment agreement with Convergenz ("Agreement"), in violation of the Agreement;

(4)   Prohibiting Defendant CSI IT, LLC from continuing to tortiously interfere with Cooper's obligations under the Agreement, including by continuing to employ Cooper in positions that violate his contractual obligations to Convergenz.

This 21st day of April, 2022.          Respectfully submitted,

**CONVERGENZ, LLC**

By: */s/ J. Barrett Kelly*
J. Barrett Kelly (VSB # 90289)
Alan Lescht (*pro hac vice*)
Alan Lescht And Associates, P.C.
1825 K St., NW, Ste. 750
Washington, DC 20006
T: 202.315.1742
F: 202.463.6067
barrett.kelly@leschtlaw.com
alan.lescht@leschtlaw.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 21st day of April, 2022, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF System, which will send a notification of such filing

(NEF) to all counsel of record.

By: <u>*/s/ J. Barrett Kelly*</u>
J. Barrett Kelly (VSB # 90289)
Alan Lescht (*pro hac vice*)
Alan Lescht And Associates, P.C.
1825 K St., NW, Ste. 750
Washington, DC 20006
T: 202.315.1742
F: 202.463.6067
barrett.kelly@leschtlaw.com
alan.lescht@leschtlaw.com
*Counsel for Plaintiff*